UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHY LOU THICK                          CASE NO. 2:18-CV-10154

        *Plaintiff*,                     DISTRICT JUDGE PAUL D. BORMAN
*v.*                                     MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 15, 17)

## I.     RECOMMENDATION

        In light of the entire record in this case, I conclude that substantial evidence does not support the Commissioner's denial of benefits. Therefore, I recommend **GRANTING** Plaintiff's Motion, (Doc. 15), **DENYING** the Commissioner's Motion, (Doc. 17), and **REMANDING** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.    REPORT

### A.     Introduction and Procedural History[1]

        Plaintiff applied for Title II Disability Insurance Benefits (DIB) on December 10, 2014, (Agency Record, R. 12, PageID.276), and for Supplemental Security Income (SSI) on December 18, 2014, (R. 12, PageID.203). The Commissioner denied the claims. (R. 12,

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income. (R. 4.)

1

PageID.202-03.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which occurred on December 6, 2016. (R. 12, PageID.72-117.) The ALJ issued a decision on January 13, 2017, finding Plaintiff was not disabled during the relevant period. (R. 12, PageID.58-66.) On November 15, 2017, the Appeals Council denied review. (R. 12, PageID.46.)

Plaintiff sought judicial review on January 12, 2018. (Pl. Compl., R. 1). She then filed the instant Motion for Summary Judgment on April 26, 2018, (Pl. Mot., R. 15), and the Commissioner countered with its own Motion a month later, (Def. Mot., R. 17). Plaintiff has replied, (Pl. Reply, R. 18), and the case is now ready for resolution.

### B.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that

you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform

3

given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### C.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 12, PageID.58-66.) At step one, the ALJ found that the last date Plaintiff could claim insurance for (i.e., the last date of insured status) was March 31, 2019. (R. 12, PageID.60.) Though Plaintiff had worked since her alleged onset date of March 1, 2012, her earnings did not rise to the level of substantial gainful activity. (*Id.*)[2] At step two, the ALJ concluded that Plaintiff had the following severe impairments: left leg venous condition with ongoing occlusions and degenerative disc disease of the lumbar spine. (R. 12, PageID.61.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.*) Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> [s]edentary work as defined in 20 CFR 505.1567(a) and 416.967(a) except the claimant cannot use foot controls with left lower extremity. She cannot climb ladders, ropes, or scaffolds can [sic] occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.

(*Id.*) At step four, the ALJ found that Plaintiff had no relevant past work experience, and at step five, the ALJ determined that Plaintiff could perform a significant number of jobs

---

[2] Plaintiff's counsel wrote the ALJ prior to the decision that Plaintiff wished to amend her onset date to February 24, 2015. (R. 12, PageID.295.) The ALJ noted this request at the start of his decision, (R. 12, PageID.58), yet continued to refer to the earlier onset date throughout the body of the opinion, (R. 12, PageID.60). The opinion's analysis, however, does not turn on the onset date—the ALJ does not suggest, for example, that the dearth of records from the earlier period led him to deny the claim.

in the national economy. (R. 12, PageID.64-65.)

### D.    Administrative Record

#### 1.    Medical Evidence

I have reviewed the entire medical record but will not detail its contents here. Instead, I will discuss the materials as necessary in the analysis.

#### 2.    Application Reports

Plaintiff's primary physical ailment is chronic deep vein thrombosis. See, e.g., (R. 12, PageID.399.) In February 2015, Plaintiff completed a Function Report in conjunction with her application for benefits. (R. 12, PageID.309-16.) Her medical problems, she explained, centered on her legs. "After standing on my feet for a period of time it begins to hurt and swell in my leg and foot. (left leg)." (R. 12, PageID.309.) The swelling was such that she had to elevate her whole leg. (*Id.*) Walking and dressing were also a struggle. (*Id.*) Additionally, she claimed that pinched nerves caused arm tingling and made it difficult to hold onto items without dropping them. (*Id.*) During a typical day, she readied her 7-year-old son for school and dropped him off and picked him up. (R. 12, PageID.310.) She would also do any necessary errands, "[l]ift laundry," "stand while making dinner," and "relax [the] rest of the day." (*Id.*) She took care of her son, providing shelter, clothes, food, and other necessities; in these tasks, she had no assistance from others. (*Id.*)

Her leg pain affected her sleep, as did her need to elevate the leg during the night. (*Id.*) Personal care became toilsome. Jeans did not fit over her leg when it was swollen; lifting her arms to wash or style her hair was hard; and tingling arms made other personal care tasks difficult, including grabbing utensils in the kitchen, lifting laundry baskets, and

similar tasks. (*Id.*) Nonetheless, she prepared meals three times a day, although she looked for easier options. (R. 12, PageID.311.) As for household work, she dusted and sometimes vacuumed without help. (*Id.*) Yardwork could be done when her pain was gone. (R. 12, PageID.312.) She left the house daily for her son's school, and she could both drive and ride in a car without assistance. (*Id.*) But while driving it was "sometimes . . . hard to hang on[to] the wheel." (*Id.*) Grocery shopping occurred three times a month, each trip lasting 30 minutes to an hour-and-a-half. (*Id.*) Handling money—e.g., paying bills and counting change—presented no problems. (*Id.*)

She used to enjoy walking, biking, swimming, and sewing. (R. 12, PageID.313.) But those activities had stopped with the onset of her illness. (*Id.*) Her social activities included talking on the phone (using the speaker to spare her hands from holding the phone) or texting; she also weekly went to her grandmother's or friends' houses to relax and watch television. (*Id.*) She had no problems getting along with others, but "people" said she had become moody. (R. 12, PageID.314.)

Her condition affected a litany of abilities, including lifting, squatting, bending, standing, reaching, walking, stair climbing, and using her hands; but it did not affect sitting, kneeling, talking, understanding, or other abilities. (*Id.*) In general, she could not move her arms "properly" or "walk distances." (*Id.*) Her walking range was a block, "if that," and she needed a 5- to 10-minute break after traversing that distance. (*Id.*) She had no problems with attention, following instructions, or getting along with others. (R. 12, PageID.314-15.) She did not handle stress or changes in her routine well—when stressed, she isolated herself and would cease pleasurable activities. (R. 12, PageID.315.) She did not use any

assistive device to help her walk. (*Id.*)

Ending, she noted that stents had been placed in her left leg to facilitate blood flow. (R. 12, PageID.316.) Clogs had recurred, however, and she may have to undergo yet another painful procedure. (*Id.*) And her lower back now had constant pain. (*Id.*)

### 3.    Administrative Hearing

At the hearing, Plaintiff testified that her mother paid for her apartment and checked on her daily, helping her with things that needed to be done. (R. 12, PageID.78.) She went to her mother's house "once in a while" and would reciprocate by helping pick up the living room or other simple things. (R. 12, PageID.78-79.) Past jobs had been part-time because she was raising children and receiving child support. (R. 12, PageID.82-83.)

Three to five pounds was the most Plaintiff could lift, she said; but when she also said that she could lift a gallon of milk, the ALJ observed that a gallon was about eight pounds. (R. 12, PageID.84-85.) Also, she lifted items weighing more than three pounds while working, although she did not lift for long periods. (R. 12, PageID.102.) At most, she could stand for 20 minutes. (R. 12, PageID.85.) It was about the same for walking, and after half a block, her left leg (but not her right, which had never hurt) would ache. (R. 12, PageID.85, 88-89.) Two days a week, she could not walk at all. (R. 12, PageID.87.) She did not use a cane, but had used a walker briefly after being hospitalized for blood clots in 2010. (*Id.*)

Her leg symptoms began in 2010. (R. 12, PageID.85.) Physical therapy made the "tingling" in her limbs stop. (*Id.*) She still did some of the exercises she learned at therapy. (R. 12, PageID.86.) Asked about sitting, Plaintiff said she had "problems" and could not

sit for longer than 20 minutes. (*Id.*) The ALJ noted that she had remained seated at the hearing for about an hour and 15 minutes. (*Id.*) Plaintiff stated that her leg burned, itched, throbbed, and developed "charley horses" if she sat too long. (R. 12, PageID.86-87.) The itching came from dermatitis. (R. 12, PageID.93-94.) Her blood clots had returned the prior summer. (R. 12, PageID.88.) The pain from her leg and back combined to make work impossible. (*Id.*)

Currently, she worked at a grocery store two days a week for four hours each day. (R. 12, PageID.89.) If the store asked her to work "three or four days a week for four hours," she would "try it for a day, one shift to see if I could do it," she said. (R. 12, PageID.91.) If she continued doing her present tasks, she estimated that 12 hours a week was the most she could work. (R. 12, PageID.92.) During the workday, she had a 15-minute break about halfway through the 2-hour shift; otherwise, she was standing or walking during work. (*Id.*) By the time a shift was over, the pain was unbearable. (R. 12, PageID.93.)

Her left arm tingled "[e]very once in a while," but she could shake it off. (R. 12, PageID.98.) She also suffered from gut pain, and her left renal vein had narrowed, but the doctors found nothing "operable or anything like that." (*Id.*)

At this point in the hearing, she mentioned she had upcoming appointments with her vein specialist, Dr. Scott Garner. (R. 12, PageID.98-99.) The ALJ stated that he would like to get records from that visit and from a few past visits "because I think we're missing some stuff[.]" (R. 12, PageID.99.) Plaintiff's counsel agreed that those records should be obtained, and the ALJ put a close date of January 6, 2017 on the record. (*Id.*) Counsel said

that he had already requested the materials. (*Id.*)

Returning to the questioning, the ALJ noted that recent records showed that Plaintiff had deep vein thrombosis. (R. 12, PageID.100.) The upcoming appointment was to discuss surgery on this condition, Plaintiff testified. (R. 12, PageID.101.) Dr. Garner had performed surgery in the past to remove her first set of stents in late 2014, and his partner "did the second set" in March 2015. (R. 12, PageID.102.) Her doctors told her she needed a spinal fusion, due to nerve root impingement. (R. 12, PageID.107.) But she decided not to have the surgery because recovery would take six to seven months. (*Id.*).

Her son mostly took care of himself "[as] far as getting dressed and things like that[.]" (R. 12, PageID.104.) They lived in an upstairs apartment, forcing her to ascend seven painful steps to reach her door. (R. 12, PageID.104-05.) While cooking, she alternated between sitting and standing, and her mother would help prepare the meals or cook them herself. (R. 12, PageID.106.) She had not needed to grocery shop "in quite a while" because her grown up daughters had been helping with that. (R. 12, PageID. 106-07.)

She had worked for years at Big Lots for 12 to 20 hours per week, but in 2015 they dropped her hours to 3 per week. (R. 12 PageID.108.) She would have stayed at the job had more hours been available, and she stated that she would have attempted to work 30 hours per week. (R. 12 PageID.109.) She had also worked one 8-hour shift at a hotel doing laundry and kitchen work, but the management never returned her calls afterward and she was not hired. (R. 12 PageID.110.)

The ALJ then stated that he did not believe Plaintiff could do light work (i.e.,

standing and walking for up to six hours of an eight-hour workday, five days a week). (R.

12 PageID.111.) But if she had a job where she could alternate standing and sitting at her

leisure, would she try it? (*Id.*) "I would say I'd have to try it to see if it would work out,"

she responded. (R. 12 PageID.112.) At home, she could wear loose clothing and elevate

her leg: "I have to elevate it because the doctors say that elevation helps with the swelling."

(*Id.*) The ALJ responded,

> Let your doctor know that, and Mr. Biebyuck [i.e., her counsel] might want
> to[] get involved with this. If you can fill out like and RFC form and if he
> wants to tell me that you have to elevate your leg for half of an eight-hour
> workday, then you would be disabled, especially if [y]ou're having to elevate
> it to any degree. . . .
>
> So if he wants to make, this is the vein specialist, that [sic] would be
> important information for me to have. So that's kind of a missing piece right
> now. And that would take you out of even being able to do sedentary work.
>
> I'm not telling you to put words in the guy's mouth, but just get his
> opinion on how long and does he tell you to elevate or are you just noticing
> it helps?

(R. 12, PageID.113.) "[H]e has told me," Plaintiff replied. (*Id.*) The ALJ stated, "So get

some specifics on how many hours a day and just have him sign off on something." (*Id.*)

Counsel said he would follow up on his previous request for documents, and Plaintiff stated

she would mention it when she saw Dr. Garner. (*Id.*) Later, the ALJ added that he wanted

to know from Dr. Garner on what date Plaintiff needed to start elevating her leg. (R. 12,

PageID.117.)

> The ALJ then asked the vocational expert to

> Assume an individual the same age, education and work experience as
> claimant. She could work at the sedentary exertional level. She would also
> need a sit/stand option at-will provided she's not off-task more than 10

10

percent of the work period.

> She would not be able to do any foot control at all with the left lower extremity. Additionally, no ladders, ropes, and scaffolds. Only occasional ramps and stairs. Occasional balance, stoop, kneel, crouch, crawl.

(R. 12, PageID.115.) Could such an individual perform jobs in the national economy? Yes, the expert replied: "wholesale/retail trade industry along with the security industry, electronic surveillance monitor positions" (200,000 positions nationally); addresser position (90,000 jobs nationally); and cashier (180,000 positions nationally). (R. 12 PageID.116-17.) If the individual had to elevate her leg two hours in each eight-hour workday, the expert concluded that the individual would be precluded from full-time work. (R. 12 PageID.117.) She also could not work if the leg elevation took her off-task at least 20 percent of the workday. (*Id.*)

### F. "Sentence Six" Analysis

#### 1. Factual Background

Plaintiff's argument centers on the RFC form requested by the ALJ at the hearing on December 6, 2016. To fully understand the contentions, some additional background is necessary. Recall that at the hearing the ALJ indicated that Plaintiff "would be disabled" if her treating doctor—Dr. Garner, at Vein Solutions—produced an opinion that she needed to elevate her leg for half of an eight-hour workday. (R. 12, PageID.113.) The record would remain open for that and other records from 2015. (R. 12, PageID.100.) About a month later, on January 3, 2017, Plaintiff's counsel at the time, William Biebuyck, wrote the ALJ that he had not been able to obtain all the records but did receive "another copy of the RFC." (R. 12, PageID.295.)

The RFC form, completed on December 16, 2016, was received post-hearing and considered in the ALJ's opinion. (R. 12, PageID.58, 576.) It contained three pages, but should have contained four—it was missing the third page. (R. 12, PageID.574-76.) This is evident from the gap in the contents between last two pages. The last question on page two was numbered 11(g), while the first question on the next page was 12(m). (R. 12, PageID.575-76.) Additionally, the second page's internal pagination marked it as page "2," while the next sheet was page "4." (*Id.*) Finally, the form contains various fax transmission lines at the top of each page. The earliest line contains a transmission date from December 6, 2016. It includes pagination, beginning with "page 1," then "page 2," and skipping to "page 4." The third page was missing.[3]

Dr. Garner's truncated, three-page RFC states that Plaintiff can sit for two hours before needing to stand and can stand for only one hour. (R. 12, PageID.574-75.) Plaintiff would also need to walk for 1 minute every 30 minutes and would have to take unscheduled 10-minute breaks every 90 minutes. (R. 12, PageID.575.) She would be off task at least 25 percent of the workday. (R. 12, PageID.576.) The form did not include any opinion on leg elevation.

---

[3] It is difficult to make much sense of these fax transmission headers. It appears that the first transmission contained four pages of material. The second set of headers came on December 14, 2016, apparently from Dr. Garner's office, as "VEINSOLUTIONS" appears in the transmission line. The pagination suggests that only four pages were sent. The pages labeled 2, 3, and 4, correspond to RFC pages 1, 2, and 4, respectively. In other words, the fax from Vein Solutions did not contain the third RFC page unless it was faxed out-of-order as page 1 of the transmission. Finally, the last transmission is dated December 19, 2016. Like the fax from Vein Solutions, its pagination leaves no room for the missing third page, i.e., it does not appear that the page was faxed, at least not in the proper order.

The ALJ issued his decision on January 6, 2017. (R. 12, PageID.58-66.) It did not mention the absent leg-elevation opinion or that Dr. Garner's RFC form appeared incomplete. Instead, after recounting the contents of the opinion, the ALJ offered a brief analysis:

> The undersigned gives this assessment little weight. Although a treating source, his conclusions are not entirely consistent with his treatment notes and the record as a whole. For example, his findings contract [sic; contradict?] the claimant's reported abilities as she testified she could stand for two hours at a time while working in late 2016.

(R. 12, PageID.63-64.)

After the decision, Plaintiff obtained new counsel and sought review by the Appeals Council. (R. 12, PageID.274, 337.) As part of the appeal, Plaintiff submitted records to the Council that the ALJ had not seen. One such file appears to be page 3 from Dr. Garner's RFC, although it bears no signature or date. (R. 12, PageID.158.) It indicates that Plaintiff had to elevate her leg above heart-level for 25 percent of an eight-hour workday. (*Id.*) In her brief to the Council, Plaintiff cited this as the missing page of Dr. Garner's report and noted the ALJ's comment at the hearing that this information was needed "to render a favorable decision." (R. 12, PageID.338.) But the Council denied review, stating that, along with other new submissions, the "medical source statement from Scott Garner, M.D. dated December 12, 2016 . . . . does not show a reasonable probability that it would change the outcome of the decision." (R. 12, PageID.47.)

Plaintiff's present brief admits she does not know why the third page went missing at the ALJ stage. (R. 15, PageID.607.) The prior counsel had faxed a form RFC for Dr. Garner to complete: "It is not clear if page 3 of the document was stuck to page 2 going

from the fax after it was completed by Dr. Garner or if it stuck to page 2 when plaintiff's prior counsel faxed it into the ERE system and uploaded it to her hearing exhibits." (*Id.*) For its part, Defendant observes that without a signature or date, the new page's authorship is "at best an educated guess," although Defendant is quick to claim that it has "no reason to doubt counsel's averrals as to its provenance." (R. 17, PageID.620.) In response, Plaintiff attaches to her reply brief the full fax received from Vein Solutions on April 11, 2017, containing both a coversheet and the completed RFC page three. (R. 18, PageID.637-38.) The fax transmission header on both pages match, indicating that they were part of the same transmission.

## 2.    Legal Background

Courts are authorized to review certain final decisions of the Commissioner under 42 U.S.C. § 405(g):

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

Claimants can seek review of an ALJ decision by the Appeals Council, 20 C.F.R. §§ 404.967, 416.1467. But when the Council denies review, the ALJ's determination becomes the final reviewable decision. 20 C.F.R. §§ 404.981, 416.1481; *Meeks v. Sec'y of Health & Human Servs*, 996 F.2d 1215, 1993 WL 216530, at *1 (6th Cir. 1993) (unpublished). In such cases, even though the claimant might have submitted additional evidence to the Council, 20 C.F.R. §§ 404.970(a), 416.1470(a), that evidence "cannot be considered part

14

of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

New evidence, however, can lead to a remand under certain conditions. In general, two types of remands are available under 42 U.S.C. § 405(g). See generally *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 725 n.3 (6th Cir. 2014). The statute states in relevant part,

> [Sentence Four:] The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. . . . [Sentence Six:] The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). A "'sentence four' remand involves a substantive ruling by the court as to the correctness of the Commissioner's decision and a subsequent remand for further proceedings in light of that determination." *Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 434 n.1 (6th Cir. 2016). By contrast, a "sentence six" remand addresses cases in which new evidence has cropped up. See *Martinez v. Comm'r of Soc. Sec.*, No. 1:15-CV-605, 2016 WL 2907844, at *7 (W.D. Mich. May 19, 2016) ("When a plaintiff submits evidence that has not been presented to the ALJ, a court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand."). Such a remand does not opine on the merits of the Commissioner's decision but rather "remands because new evidence has come to light that was not available to the claimant at the time of the

15

administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Remand under "sentence six" is not appropriate unless the claimant shows: (1) "the evidence at issue is both 'new' and 'material,'" and (2) "there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Any evidence offered after the ALJ decision is potentially "new evidence" for purposes of the court's review. *Wyatt v. Sec'y of Health & Human Servs*, 12 F.3d 216, 1993 WL 492311, at *3 (6th Cir. 1993) (unpublished). It is material only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). This Circuit's "harder line" approach to "good cause" requires the claimant to "demonstrate[] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

### 3. Application

#### i. Is the Evidence New?

Under the framework above, the first question is whether page three of Dr. Garner's

RFC is "new evidence." Plaintiff argues that the page "is 'new' as it was technically rendered before the date of the ALJ's decision but was just missing from the document due to electronic error." (R. 15, PageID.607.) That is all Plaintiff says about newness in her main brief. Defendant points out that it is unclear when the page was filled out. (R. 17, PageID.620-21 & n.4.) Had page three been emblazoned with a fax transmission from December 2016, that fact would support Plaintiff's contention it was completed prior to the ALJ decision. (*Id.*) Plaintiff counters that the absence of a transmission header "proves that it was completed prior to submission to the Appeals Council and after the ALJ's decision and is therefore[] 'new and material.'" (R. 18, PageID.632.) The theory behind this assertion appears to be that the lack of the header shows the page was not sent to Plaintiff's prior counsel before the ALJ's decision. (*Id.*)

In essence, then, Plaintiff premises the page's newness on its having been completed before the ALJ issued his decision, lost, then copied or reproduced after the ALJ's decision. But if the page was the same one Dr. Garner filled out before the decision, it would be "old" evidence. Further, the absence of a relevant fax transmission header on page three does not prove when it was filled out—it merely shows that the RFC was not faxed at that time. Plaintiff's new counsel also admits she "uses the same form [as the old counsel] and was able to fax it to Dr. Garner's office for completion on April 11, 2017." (R. 15, PageID.607.) This statement suggests that page three came from a fresh form, completed in April 2017.[4]

---

[4] The Appeals Council appears to have credited Plaintiff's view of the page's origins, as it described the page as part of the December 16, 2016 RFC form. (R. 12, PageID.47.) Generally, the Commissioner's

It is difficult to unravel the factual tangle of page three's provenance, i.e., when Dr. Garner's ink met the page. And thus it is difficult to determine whether the page existed prior to the ALJ's decision. Despite Plaintiff's supposition that it did exist in some form, she has submitted a "page 3" that Dr. Garner sent only *after* the decision; what is more, Plaintiff's brief states that her new counsel mailed that page to Dr. Garner for completion post-decision. So the form likely was filled out—i.e., came into existence—subsequent to the decision. The evidence goes no further than permitting this conclusion. Ultimately, then, the evidence was obtained from the medical source post-decision and should therefore be considered "new," in the sense that it did not previously exist.

The question of the form's pre-decision availability is somewhat more difficult but does not lead to a different outcome. Assuming the page Plaintiff submitted did not exist before the ALJ decision, it is not apparent that it could have been considered available. That is, it is not clear that evidence created post-decision should be considered "old" (i.e., not "new") simply because the evidence could have been *created* before the decision. Rather, the fact that evidence could have been developed and acquired by Plaintiff before the decision appears to be a factor considered under the "good cause" analysis. See *Perkins v. Apfel*, 14 F. App'x 593, 598 (6th Cir. 2001) ("The mere fact that the evidence at issue was not created until nine months after the ALJ's decision and was not submitted to the Appeals Council until nearly a year after the ALJ's decision does not establish good cause.

---

factual findings, if supported by substantial evidence, are "conclusive." 42 U.S.C. § 405(g). But even assuming the Council's statement was a factual finding, it did not come in a final decision currently under this Court's review, as explained more below. See *Roberts v. Comm'r of Soc. Sec.*, No. 17-cv-12458, 2018 WL 4478814, at *3 (E.D. Mich. Sept. 19, 2018). Thus, the Court is not bound by the Council's date.

18

This Court takes a harder line: Perkins must establish good cause for his failure to obtain the evidence prior to the hearing."); see also *Oliver*, 804 F.2d at 966 (noting that "good cause" requires a reasonable justification for failing to timely *acquire* the evidence).

Thus, I conclude that on the showing before the Court the page should be considered "new." Regardless, the determination of newness is not dispositive, as I conclude below that Plaintiff's argument fails for lack of "good cause."

### ii.    Is the Evidence Material?

Regarding materiality, Plaintiff states that page three is "'material' to the issue of whether the plaintiff needed to elevate her leg and was opinion evidence the ALJ specifically requested. He stated he would find the plaintiff disabled if he had it." (R. 15, PageID.607.) Defendant states that "[i]t is difficult to discern how an undated, unsigned single-page document drafted at least three months after the ALJ's decision can constitute material evidence." (R. 17, PageID.623-24.)[5] Even if the page came from Dr. Garner's December 2016 RFC opinion, Defendant still believes that it offers no reasonable probability of a different outcome. (R. 17, PageID.624-25.) The ALJ gave little weight to Dr. Garner's opinion because it was inconsistent with other evidence; Plaintiff has not challenged this assessment or "mitigate[d] the inconsistencies identified and relied upon by the ALJ." (R. 17, PageID.624.) Further, Defendant argues that the ALJ gave "good

---

[5] Defendant follows this statement with a citation to a case standing for the proposition that post-decision evidence created to rebut the ALJ's analysis does not meet the "good cause" requirement. (R. 17, PageID.624, citing *Curtis v. Comm'r of Soc. Sec.*, No. 16-11062, 2017 WL 957454, at *6 (E.D. Mich. Feb. 21, 2017), *Rep. & Rec. adopted by* 2017 WL 951271 (E.D. Mich. Mar. 9, 2017)). But given the ALJ's explicit invitation to produce Dr. Garner's medical opinion after the hearing, it is hardly fair to suggest that Plaintiff is attempting to opportunistically pounce on a weak point in the ALJ's decision.

reasons" for according the opinion this weight, including Plaintiff's positive response to treatment, "her ability to work in a position that required standing for four-hour shifts, and her expressed belief that she could (or would try) to perform a sedentary job if given the opportunity." (R. 17, PageID.625.)

One could quibble with Plaintiff's argument that the evidence is material. Assuming the page comes from Dr. Garner—and there is no reason to conclude otherwise, despite Defendant's attempt to raise doubts on this point—it is only a single sheet, and it is not responsive to the ALJ's concerns about the opinion's consistency with the record. It does not explain the basis for Dr. Garner's conclusion but instead offers the sort of "rudimentary indications" that courts have considered to be "'weak evidence at best.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (citation omitted). Additionally, as Defendant points out, Plaintiff's current employment was evidence the ALJ could rely on. 20 C.F.R. § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (noting that the ALJ could discredit the plaintiff's claim of debilitating illness due to her recent work experience and the fact she "sought out other employment since then").[6]

---

[6] Plaintiff's testimony that she would attempt longer work hours if asked is less persuasive evidence of her ability to work. The statement might indicate nothing more than hope of leading a normal life, or it might be prompted by overwhelming financial need. See *Voigt v. Colvin*, 781 F.3d 871, 876-77 (7th Cir. 2015); *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

Nonetheless, given the ALJ's strong suggestion that Dr. Garner's leg-elevation opinion would be meaningful, I would conclude that it is material. True, the ALJ's statement did not directly convey that he would, without doubt, find her disabled if Dr. Garner opined that she needed to elevate her leg for half the workday. The statement could be read as merely informing Plaintiff that such an opinion would provide a *basis* for finding her disabled. But the ALJ was more concrete than that, stating that if Dr. Garner offered such an opinion "then you would be disabled" and it "would take [Plaintiff] out of even being able to do sedentary work." (R. 12, PageID.113.) While the ALJ was discussing the need to elevate the leg for half the workday, and Dr. Garner opined that Plaintiff needed to raise the leg for one-quarter of the workday, the evidence is still material because the VE testified that a two-hour leg elevation requirement (25 percent of the day) would preclude work. (R. 12 PageID.117.) Thus, if credited, Dr. Garner's treating opinion could be dispositive.

Further, the opinion comes from a treating source and involves the nature and severity of Plaintiff's limitations, thus (as discussed more below) entitling it to controlling weight absent "good reasons." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ gave Dr. Garner's opinion little weight due to inconsistencies with the record, but he only named one: Dr. Garner opined that Plaintiff could stand for only one hour at a time, while Plaintiff testified she could stand for two. (R. 12, PageID.63-64.)

Even assuming for now that this one-hour inconsistency reasonably devalues Dr. Garner's opinion (more on that below), it involves standing rather than leg elevation. The only piece of evidence the ALJ anywhere cites that could directly conflict with Dr. Garner's

leg-elevation opinion is the opinion from Diane Gutchak, a nurse practioner who treated Plaintiff. (R. 12, PageID.64, 577.) Gutchak filled out a checkbox form—only half a page in length—stating that Plaintiff had to elevate her legs "every 4 hours during an 8 hour work shift for 15-20 minutes." (R. 12, PageID.577.) But as the ALJ observed, Gutchak was not an "acceptable medical source" and therefore could not establish that an impairment exists. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). And the record contains other indications that Plaintiff needed to raise her leg. For instance, in July 2014, a doctor recommended that she elevate her leg and apply icepacks, along with using the compression stockings she usually wore and taking her medication. (R. 12, PageID.419-20.) Likewise, treatment notes indicate that Plaintiff stated elevation helped, (R. 12, PageID.308), although sometimes it failed to provide relief, (R. 12, PageID.361, 365.)[7]

Thus, Dr. Garner's opinion on the matter would introduce the only "acceptable" source opinion from a treating medical provider, and the ALJ strongly indicated it would lead to a favorable outcome for Plaintiff. Consequently, the evidence offers a reasonable possibility of changing the outcome below and is therefore material.

### iii. Was There Good Cause?

Plaintiff does not elaborate on "good cause," but it appears she believes the "fax transmission error" satisfies the requirement. (R. 15, PageID.609.) Defendant pins the problem on the failure of Plaintiff's counsel at the administrative level to ensure the page

---

[7] Also, in other post-hearing notes, a physician opined that Plaintiff would need to elevate her leg for 25 percent of an 8-hour workday, although the opinion also states that Plaintiff could return to work within a few days. (R. 12, PageID.156-57.) Plaintiff does not premise her argument for remand on these other records or suggest that they constitute new and material evidence.

was submitted. (R. 17, PageID.622.) "[H]ad Plaintiff's administrative representative exercised reasonable diligence he could (and should) have recognized that a page was missing and promptly obtained and submitted it to for [sic] inclusion in the record, or notified the ALJ of the omission and requested additional time to do so." (R. 17, PageID.622-23.) Courts have been clear, however, that such mistakes by counsel do not constitute good cause. (R. 17, PageID.621-22.) Therefore, according to Defendant, Plaintiff lacked "good cause" for her untimely submission.

I agree with Defendant's analysis. Plaintiff's counsel knew the ALJ wanted Dr. Garner's opinion on leg elevation. They discussed it at the hearing and the ALJ mentioned that counsel "might want to[] get involved with this." (R. 12, PageID.113.) And counsel had an affirmative duty to help obtain and submit evidence and "comply[], as soon as practicable, with [the Commissioner's] requests for information or evidence at any stage of the administrative decisionmaking process." 20 C.F.R. § 404.1740(b)(1)-(2).

This duty is important because, ultimately, it falls on the Plaintiff to prove her disability by submitting all relevant evidence. 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1). Yet, counsel here did not make certain that Dr. Garner's complete RFC form was submitted. If counsel never received the form from Dr. Garner's office, it would have been easy enough to discern this oversight.[8] Indeed, he told the ALJ that his post-hearing request

---

[8] Because Dr. Garner did respond to counsel's request, although perhaps incompletely, it is not the case that the failure to receive page three rests entirely with Dr. Garner. Compare *Hughes v. Comm'r of Soc. Sec.*, No. 07-CV-11920, 2008 WL 4279375, at *3 (E.D. Mich. Sept. 17, 2008) ("[G]ood cause justified Plaintiff's failure to incorporate the reports as evidence in the administrative proceedings inasmuch as Plaintiff requested the reports from Dr. Field's office in a timely manner but did not receive the reports, through no fault of his own, until after the ALJ issued his opinion on November 23, 2004.").

produced only "another copy of the RFC." (R. 12, PageID.295.) Thus, the absence of page three would not have been obscured by a deluge of other files. And if counsel had page three but failed to successfully transmit it to the Commissioner, it appears that the Commissioner's transmission procedures would have permitted him to discover the error. See Soc. Sec. Admin., *Electronic Records Express; Frequently Asked Questions*, (last visited November 18, 2018) (noting that electronic submissions can be printed and stored, and that fax machines should indicate successful transmissions), *available at* https://www.ssa.gov/ere/faq.htm.

The missing page would not have been so apparent to anyone else. While Dr. Garner's RFC sheet had numbered pages and it could be seen that page "3" was not included, it would not have been obvious to anyone except counsel that Dr. Garner had received that page and filled it out, or that the missing page included an opinion on leg elevation.[9] When the ALJ received the RFC he would not have known that Plaintiff intended it to have page three. Consequently, counsel appears to have been the source of the mistake and was in the best (perhaps only) position to make the easy fix. The cause for the error thus rests with counsel.

Courts generally hold that an attorney's errors do not constitute "good cause." As the Sixth Circuit has observed, "there is absolutely no statutory or decisional authority for

---

[9] Plaintiff does not argue that the ALJ failed to develop the record or should have discovered that relevant information was missing and obtained it himself. See 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1) (noting that the Commissioner will aid in obtaining medical evidence); *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (noting the ALJ's duty to develop the record). Given the above, it does not appear that Plaintiff could succeed on such an argument. Cf. *Glasco*, 645 F. App'x at 436 (noting that the Commissioner could not be blamed for failing to "comb through thousands of pages of medical records for references to other potential treating sources, to which it must then submit record requests").

. . . [the] unstated premise that the alleged incompetence of [the claimant's] first attorney constitutes 'good cause' in this context." *Taylor v. Comm'r of Soc. Sec.*, 43 F. App'x 941, 943 (6th Cir. 2002); see also *Jackson v. Comm'r of Soc. Sec.*, No. 07-14184, 2009 WL 612343, at *3 (E.D. Mich. Mar. 6, 2009) ("Mistakes by an attorney are not considered to be 'good cause' for purposes of a remand under Sentence Six."); *Jensen v. Berryhill*, No. 4:16-CV-272, 2018 WL 1542237, at *7 (E.D. N.C. Mar. 29, 2018) ("Courts have repeatedly held that attorney mistakes are not considered 'good cause' in this context."); *Cross v. Colvin*, No. 6:16-CV-0111, 2016 WL 7011477, at *5 (N.D. N.Y. Dec. 1, 2016) ("[T]he omissions of Plaintiff's former counsel do not establish good cause to obtain a sentence six remand."); *Shaver v. Colvin*, No. 3:13-CV-00388, 2014 WL 3854143, at *5 (W.D. N.C. Aug. 6, 2014) ("Courts around the country, however, have repeatedly held that '[m]istakes by an attorney are not considered to be 'good cause' for purposes of a remand under Sentence Six.'" (citation omitted)). This Court has rejected arguments that counsel's "past failure to supplement the record" represents "good cause." *Firth v. Comm'r of Soc. Sec.*, No. 2:16-cv-14165, 2017 WL 4169632, at *8 (E.D. Mich. July 27, 2017), *Rep. & Rec. adopted by* 2017 WL 4163684 (E.D. Mich. Sept. 20, 2017). Even an "inadvertent omission by prior counsel" in submitting evidence is not "good cause" for the failure. *Patel v. Shalala*, 17 F. Supp. 2d 662, 667 (W.D. Ky. 1998); see also *Shuter v. Astrue*, 537 F. Supp. 2d 752, 758-59 (E.D. Pa. 2008) (rejecting "good cause" where the administrative counsel failed to submit evidence due to an unexplained "misunderstanding" with the plaintiff).

Because the error here arose from counsel, and a counsel's mistakes do not constitute "good cause," Plaintiff has failed to demonstrate "good cause." One could

question the fairness of this outcome, but I believe it is required by the above authorities and also makes sense for a few additional reasons. First, in line with preceding analysis, Plaintiff's counsel was in the best position to avoid or rectify the error. From this perspective, counsel was the "cheapest cost avoider" of the present morass. Cf. Calabresi & Hirschoff, *Toward a Test for Strict Liability in Torts*, 81 Yale L. J. 1055, 1060 (1972) (defining "cheapest cost avoider" as the person in the best position to compare accident costs with accident-avoidance costs and "to act on that decision"). Second, Plaintiff was in a similar position. She, too, knew what the ALJ requested and could have verified that the request was satisfied. In fact, at the hearing the ALJ instructed Plaintiff to contact Dr. Garner about the RFC form, as she would be seeing him in a few days. (R. 12, PageID.113.) She indicated she would "take [the request] to him on Thursday." (*Id.*) The matter did not involve any complicated legal or factual analysis; rather, it required obtaining a simple opinion on how many hours during a workday Plaintiff needed to elevate her leg. And Plaintiff has not suggested that she was lulled into inaction by her counsel's representation that he had already obtained this information. Cf. *Isaac v. Astrue*, No. 3:06CV313, 2008 WL 471534, at *5 (S.D. Ohio Feb. 15, 2008) (finding "good cause" when the non-attorney representative led the claimant to reasonably believe that the record was complete when it was not). Thus, even if she were not held to the consequences of her counsel's conduct, Plaintiff had an independent basis for knowing that the evidence needed to be produced.

A third reason for the result here is that the factual circumstances regarding the mistake remain murky. Plaintiff believes that the missing page must have eluded the fax transmission because it was stuck to another sheet. But other causes are possible. And

Plaintiff has not offered an affidavit from her former counsel explaining the flubbed fax. Cf. *Shuter*, 537 F. Supp. 2d at 759 (noting neither plaintiff nor counsel offered an affidavit explaining the alleged misunderstanding that formed the basis for plaintiff's "good cause" argument). Fourth, Plaintiff has not offered any objective basis for distinguishing the caselaw that holds an attorney's mistake is not "good cause." Put differently, she has not suggested any rule that would distinguish the type of mistake here from the sorts that occurred in prior cases where "good cause" was not found due to attorney errors.

For these reasons, I conclude that Plaintiff has not shown "good cause" for the failure to present the evidence prior to the ALJ decision.

### 4.    Review of the Appeals Council's Denial of Review

Plaintiff also cites 20 C.F.R. § 404.970, apparently as providing the framework for how courts should consider post-ALJ decision evidence. (R. 15, PageID.608-09; R. 18, PageID.632-33.) Plaintiff argues that she satisfies even the present version of the rule, which includes more rigorous requirements than the previous iteration. (R. 15, PageID.609.) When the ALJ issued his decision on January 13, 2017, (R. 12, PageID.66), the regulation provided that "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). However, the Commissioner subsequently amended the regulation to require, among other things, a showing of "good cause," which could be satisfied if "[i]mportant records were destroyed or damaged by fire or other accidental cause." 20 C.F.R. § 404.970(b)(3)(iii). Plaintiff cites this subsection and states that "the fax transmission errors would have been

27

considered 'other accidental cause.'" (R. 15, PageID.609.)

Plaintiff's reliance on this regulation suffers from multiple problems. As an initial matter, she has not shown that the record at issue was "destroyed or damaged"—her argument seems to be that it was neither destroyed nor damaged and it now appears essentially in the same manner as completed by Dr. Garner in December 2016. So it is unclear how 20 C.F.R. § 404.970(b)(3)(iii) provides "good cause." More important, the regulation was not being enforced when Plaintiff sought review from the Appeals Council. While the regulatory amendments were effective January 17, 2017, the Commissioner's notice adopting the changes stated that "compliance is not required until May 1, 2017." Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90,987, 90,987 (Dec. 16, 2016). In this case, the Council informed Plaintiff that "[b]ecause your case was pending at the Appeals Council before our rule about when to give us evidence became effective, we will find that you showed good cause for not submitting additional evidence earlier." (R. 12, PageID.121.)

More important still, the regulation applies to the Appeals Council's review process, not the court's. Plaintiff does not ask us to review that process. Rather, she requests a "sentence six" remand. And when the Council denies review, the Court does not review that decision; it examines the ALJ's determination, which as described above represents the Commissioner's final decision. 20 C.F.R. §§ 404.981, 416.1481; *Meeks*, 1993 WL 216530, at *1. "While new material evidence may be submitted for consideration to the appeals council pursuant to 20 C.F.R. § 404.970, on appeal we still review the ALJ's

decision, not the denial of review by the appeals council." *Casey*, 987 F.2d at 1233. As such, the regulation does not apply to the task at hand.

Even if Plaintiff's argument could reasonably be construed as requesting review of the Appeals Council denial, it is doubtful the Court could entertain it. The Court's jurisdiction is limited to reviewing final decisions. 42 U.S.C. § 405(g). But, as noted, the final decision in this case is the ALJ's. For this reason, the Sixth Circuit has held that "[a]n Appeal Council order denying review is not . . . a reviewable order; such an order serves only to make the decision of the ALJ the final reviewable decision of the Secretary." *Meeks*, 1993 WL 216530, at *1. Accordingly, courts in this District have found they lack authority to review the Council's denial orders. See *Roberts*, 2018 WL 4478814, at *3 ("To the extent the objection is aimed at the Appeals Council's decision denying review, the magistrate judge correctly found that the order is unreviewable."); *Davis v. Comm'r of Soc. Sec.*, No. 16-13495, 2018 WL 3259791, at *6 (E.D. Mich. Feb. 12, 2018) ("[T]he Appeals Council decision is not reviewable by this Court."), *Rep. & Rec. adopted by* 2018 WL 1150243, at *2 (E.D. Mich. Mar. 5, 2018) ("The magistrate judge correctly explained that this Court's review does not extend to the action of the Appeals Council when that body denies review."); see also *Smith v. Comm'r of Soc. Sec.*, No. 2:12-cv-12160, 2013 WL 5243448, at *16 (E.D. Mich. Sept. 18, 2013) ("[T]his Court harbors substantial doubt as to whether a federal court has the authority to grant any relief" for the Council's alleged violation of a regulation requiring the Council to allow for the filing of briefs.); *Freeman v. Comm'r of Soc. Sec.*, No. 1:07-cv-536, 2008 WL 2074019, at *4 (E.D. Mich. May 14, 2008) ("Even if plaintiff is correct in her claim that the Appeals Council failed to incorporate certain

items in the administrative record and did not perform 'a reasoned and meaningful review' of the ALJ's decision, there is no basis for the court to perform a judicial review of the Council's orders.").

Other Circuits allow limited review for legal errors. For example, the Seventh Circuit has permitted review of whether the Council committed an error of law when determining whether evidence was new and material under 20 C.F.R. § 404.970(b). See *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015); *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). The Eighth Circuit likewise has allowed review of that regulation's application: "Jurisdiction to review whether the Appeals Council has complied with the procedural requirements of the regulations does not imply jurisdiction to review the Appeals Council's non-final, substantive decision to deny review." *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992). The Sixth Circuit has not addressed the fine distinction cut by these cases. See generally *Marks v. Colvin*, No. 2:15-cv-0550, 2016 WL 233177, at *3 (S.D. Ohio Jan. 20, 2016) (noting that "[t]here does not appear to be any decisions from the Sixth Circuit" regarding "whether the Court can correct a regulatory violation which occurs during the process of Appeals Council Review"), *Rep. & Rec. adopted by* 2016 WL 814982 (S.D. Ohio Mar. 2, 2016); *Smith*, 2013 WL 5243448, at *16 (noting caselaw explaining that the Sixth Circuit has not yet adopted the distinction and allowed review of the Council's compliance with regulatory procedures).

Noting the lack of caselaw, one court in this Circuit addressing an alleged violation of 20 C.F.R. § 404.970(b) adopted the Seventh Circuit's basic holding that "procedural errors made by the Appeals Council can, if they are apparent from the record, sometimes

be corrected by a reviewing Court." *Marks*, 2016 WL 233177, at *4. But as another court pointed out when discussing courts' authority to review the Council's regulatory violations, "Circuit precedent suggests that a federal court lacks jurisdiction to review an Appeals Council decision denying a claimant's request to review an ALJ's decision." *Smith*, 2013 WL 5243448, at *16. Indeed, while not made when addressing the precise issue here, the Sixth Circuit's blanket statement that denial orders are unreviewable does not appear to admit of exceptions. See *Meeks*, 1993 WL 216530, at *1. The Circuit has even applied this holding to reject the argument that the Appeals Council violated a claimant's due process rights by allegedly failing to review his objections to the ALJ's decision. *Willis v. Sec'y of Health & Human Servs.*, 47 F.3d 1172, 1995 WL 31591, at *2 (6th Cir. 1995) (unpublished). This application suggests that the court would not find jurisdiction to review the Council's procedural errors. Such a holding also reflects the textual grant of jurisdiction encompassing only final decisions, 42 U.S.C. § 405(g), which does not include the Council's denial order. Courts allowing limited review of those orders have not pointed to comparable statutory language authorizing such review

Accordingly, I have strong doubts that the Court would have jurisdiction to review an allegation that the Council violated 20 C.F.R. § 404.970(b). But this question does not need definitive resolution here. For the reasons above, even if we had jurisdiction to review the denial order, Plaintiff is not invoking that jurisdiction here—she does not ask for review of the Appeals Council order. And, supposing she did, the only basis she puts forward is a regulatory "good cause" provision that did not apply to her case because it was not yet enforced. And if it did apply, she has not shown how she could satisfy it, as she has not

demonstrated that the pertinent record was "damaged or destroyed." 20 C.F.R. § 404.970(b)(3)(iii). Thus, this hypothetical argument fails all the way down.

### G. "Sentence Four" Analysis

While Plaintiff's brief does not argue for remand under "sentence four," Plaintiff's complaint and motion both contend that substantial evidence does not support the ALJ's decision. (R. 1, PageID.2; R. 15, PageID.587.) Motions for summary dispositions are not statutorily required to invoke a court's review. *Wright v. Comm'r of Soc. Sec.*, No. 09-CV-15014, 2010 WL 5420990, at *2 (E.D. Mich. Dec. 27, 2010). They "merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits." *Id.* For these reasons, courts in this District have not shied "from identifying error based on its own review of the record and ruling accordingly." *Buhl v. Comm'r of Soc. Sec.*, No. 12-10087, 2013 WL 878772, at *7 n.5 (E.D. Mich. Feb. 13, 2013), *Rep. & Rec. adopted by* 2013 WL 878918 (E.D. Mich. Mar.8, 2013). As one court in this District stated, "Notably, in Social Security cases, the failure to submit a particular legal argument is 'not a prerequisite to the Court's reaching a decision on the merits' or a finding, *sua sponte*, that grounds for reversal." *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013) (citation omitted); see also *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23 (E.D. Mich. Mar. 13, 2014) ("Although none of Trainor's arguments justify remand, her arguments did require the Court to review the administrative record in some detail. . . . Although this Court does not generally raise issues sua sponte, it is warranted in this case."). In reviewing the argument regarding Dr. Garner's new evidence, it became apparent that the ALJ's

handling of that treating source was inadequate. Given the centrality of Dr. Garner's opinion, raising this issue *sua sponte* is warranted.

### 1.    Legal Background

Under "sentence four," the district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The Court, likewise, must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

The regulations[10] distinguish the evidence based on whether it came from "acceptable medical sources" or "other sources." 20 C.F.R. § 404.1513 (2016); 20 C.F.R. § 416.913 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).    Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the

---

[10] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the

35

Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

### 2.   Application

For the reasons that follow, I conclude that the ALJ erred by failing to give "good reasons" for his evaluation of Dr. Garner's treating opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). As noted above, the ALJ acknowledged that Dr. Garner was a treating source. But the bulk of his analysis of the treating opinion was the its "conclusions are not entirely consistent with his treatment notes and the record as a whole." (R. 12, PageID.63-64.) The ALJ largely leaves it for the reader to determine the inconsistencies. The only one the ALJ acknowledges is that Dr. Garner's opinion that Plaintiff could stand for one hour clashed with Plaintiff's testimony she could stand for two.

36

The ALJ's vague reference to inconsistencies with the treatment notes and the record does not provide an objective and reviewable reason to reject Dr. Garner's opinion. Real inconsistences would, of course, give grounds to devalue the opinion. But the problem here is that the reviewing court must imagine what inconsistencies the ALJ intended and then determine whether those hypothetical rationales are "good reasons." This mode of analysis verges on requiring impermissible after-the-fact rationalizations for the agency decision "'that the agency had not relied on it its [disputed] decision . . . .'" *Hill v. Comm'r of Soc. Sec.*, No. 13-CV-15257, at *23 (E.D. Mich. Nov. 26, 2014) (citation omitted). Exacerbating the problem in this case is the ALJ's descriptive rather than analytical recounting of the evidence. That is, the ALJ largely described the evidence without "build[ing] a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Only one paragraph describing treatment notes appears aimed at providing reasons for the ALJ's overall outcome, although it is not directly connected to the analysis of Dr. Garner's opinion. The paragraph describes reports that, for example, Plaintiff had normal gait and had "a good range of activities of daily living." (R.12, PageID.63.) But neither here nor anywhere else in the decision does the ALJ attempt to explain why an ability to drive or normal gait indicate that Dr. Garner's opinion is ill-founded. And some of the observations in the paragraph are plucked from the record without any consideration of their representativeness. He cites, for example, an August 2014 treatment note indicating that her compression socks helped and she was "doing much better." (R. 12, PageID.63, 413.) But by the next month her legs were in sharp pain, exacerbated "by prolonged

standing and prolonged sitting" and "not relieved by elevation, rest and compression." (R. 12, PageID.305.) What is more, Plaintiff had two surgeries after August 2014 to address her pain. (R. 12, PageID.332, 485-86.) And even after these surgeries, pain and swelling continued. (R. 12, PageID.466, 481-83.) Thus the ALJ's citation to the August 2014 report provides an incomplete picture of the record.

Also, it is difficult to see how the one inconsistency the ALJ mentioned—the hour discrepancy in standing ability—is a "good reason" for according Dr. Garner's opinion little weight. The ALJ does not explain why the estimate is so glaringly misguided that none of Dr. Garner's other opinions can be trusted. The focus on standing also ignores another of Dr. Garner's opinions that would likely be dispositive if credited: that Plaintiff would be off task at least 25 percent of the time. (R. 12, PageID.576.) The VE testified that any amount of off-task time over 15 percent would preclude work. (R. 12, PageID.116.) The ALJ did not address this issue, nor is it clear that this opinion is affected at all by Dr. Garner's opinion on Plaintiff's ability to stand.

Thus, I suggest that the ALJ's barebones analysis fails to give "good reasons" for its treatment of Dr. Garner's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Accordingly, I recommend a remand under "sentence four" of 42 U.S.C. § 405(g) for proper consideration of the evidence.

### H.    Conclusion

For these reasons, I would conclude that substantial evidence does not support the Commissioner's denial of benefits and I recommend **GRANTING** Plaintiff's Motion, (Doc. 15), **DENYING** the Commissioner's Motion, (Doc. 17), and **REMANDING** to the

Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date: November 29, 2018                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 29, 2018                    By s/Kristen Castaneda
                                           Case Manager

40